Thelma LOVE, As Administrator of the
Estate of Elease Porter, Deceased,
and Willie Porter, Appellants,

v.

CF & H CORPORATION d/b/a South
Dallas Nursing Home and Leona
Hawkins, Appellees.

No. 08–00–00297–CV.

Court of Appeals of Texas,
El Paso.

Aug. 22, 2002.

Rehearing Overruled Dec. 4, 2002.

Constance M. Maher, Arlington, for Appellants.

Steven R. Pierret, Hill Gilstrap, P.C., Arlington, for Appellees.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

### OPINION

DAVID WELLINGTON CHEW, Justice.

Appellants Thelma Love and Willie Porter ("Love") appeal from the jury's verdict failing to find gross negligence against Appellees C F & H Corp. d/b/a South Dallas Nursing Home and Leona Hawkins ("Nursing Home"). Love brings a single issue on appeal: (1) The jury's failure to

find gross negligence is against the great weight and preponderance of the evidence. We affirm.

## SUMMARY OF THE EVIDENCE

On December 22, 1997, Elease Porter ("Porter") was struck by a car on a freeway and killed immediately. Love, the administrator of Porter's estate, and Willie Porter, one of Porter's sons, brought suit for wrongful death against the Nursing Home, where Porter had been staying. The jury found that the Nursing Home was negligent but not grossly negligent.

### Elease Porter

Porter suffered from Alzheimer's and schizophrenia. Her symptoms ranged from confusion and disorientation, hallucination, agitation, and wandering. Up to 1987, Porter lived with her brother, but when he passed away, Porter's nephew, Love's husband, and Love decided to let Porter live with them.[1]

Although Love was aware that Porter suffered from schizophrenia, she said that Porter was very quiet and caused no problems for the first few years until she began wandering. Love testified that the wandering manifested only when she began working and Porter was left alone in the house.

Unable to safeguard Porter's well-being, Love placed her at a nursing home. However, the nursing home was unable to protect Porter against her wandering, and a different nursing home had to be found. Love and her husband decided on the South Dallas Nursing Home, because it was closer to their home, facilitating visits, and the Nursing Home reassured them that it could handle Porter's wandering.

The Nursing Home's record of the nurses' notes showed that Porter left the facilities of the Nursing Home about twenty times from August 1, 1997 to December 22, 1997. The record shows that the Nursing Home tried to transfer Porter in November and December of 1997, but was unable to do so before the fatal accident on December 22, 1997.

### The Nursing Home

The Nursing Home is located in South Dallas, adjacent to the Central Express freeway. It housed several residents afflicted with Alzheimer's and a tendency to wander. At the time of the trial, there were around eight or ten such residents at the Nursing Home. The Nursing Home knew which residents wandered and that Porter had a tendency to wander.

Leona Hawkins has been the administrator for the Nursing Home, owned by the C F & H Corp. since 1971. Leona Hawkins and Sandra Broden (Hawkins' daughters), Stanley Kaufman, and Yvonne Hervey are CF & H's officers. From 1993 through 1995, Hawkins remodeled the facility and also added an alarm system at every outside exit door in the building. She was unaware of other kinds of systems at the time. Hawkins wished to add a fence around the building, but the City of Dallas and other authorities informed her that the fence would not be allowed, and she did not apply for a permit.

In addition to the alarm system, to protect the "wanderers," the Nursing Home's policy on difficult residents was to talk and be with the patients or medicate them, but

---

1. Porter's son, Willie Porter, is mentally handicapped and lived with his mother until she had to go into a nursing home. He tried to find his mother and cousins, the Loves, but could not remember where they lived or the nursing home. He is aware that his mother is dead and is depressed about it. Porter has two other sons, who did not support or visit her while she was in the Nursing Home.

there was no specific policy that Nurse Annie Forest was aware of. The Nursing Home also monitored its potential wanderers by checking on them at least every two hours. The nurses on different shifts maintained notes on the residents and gave oral reports to the nurses succeeding their shifts. Forest stated that they filled out incident reports when a resident wandered and reached the street or fell and hurt themselves but never when they just walked outside.[2]

On December 11, 1997, Marie Konechy, a registered surveyor for the Texas Department of Human Services ("Human Services"), investigated the Nursing Home because of an anonymous complaint of insufficient staff and the residents' wandering due to the staff's negligence. During her investigation, Konechy looked at incident reports to aid her in evaluating the Nursing Home. She found two incident reports of a resident wandering from the Nursing Home, and concerned, she reviewed his chart. She discovered from the chart that there were at least two other incidents of this resident's wandering that had not been reported, totaling at least four occasions when the resident had wandered. When she asked Hawkins' daughter, the acting director of the Nursing Home, whether there were any other residents who had wandered and about whom no incident reports had been made on their wandering, Hawkins' daughter said there were no other such residents. The wandering resident was transferred out of the Nursing Home, because it was not adequately equipped to protect him from his wandering.

Rhonda Jones, a social worker and Hawkins' granddaughter, testified that on December 22, 1997, she had been trying to "place" Porter at a different facility. Her notes showed in detail that she called Cedars Hospital on that day to inquire about medicating Porter and indicating the Nursing Home would take her back.[3] Jones said that because the other facilities would not be available quickly, she had been calling psychiatric hospitals for admission.

### The Fatal Accident

On December 22, 1997, Nurse Forest came on duty and received the report from the nurse on the previous shift. Porter had been agitated and wanting to leave the building and had left it at least once that day. That afternoon, after Porter had tried to leave or actually left at 10 a.m., 2 p.m., and 3 p.m., the Nursing Home placed Porter in a geri-chair to restrain her. Jones thought that Porter should be placed in a different facility for evaluation, and they contacted a doctor for medication to help calm Porter's agitation. At 4:30 p.m., Forest gave Porter fifty milligrams of Vistaril for the agitation.

The cook at the Nursing Home, Lizzie Traylor, said that she remembered Porter in the dining room at around 5 p.m. on December 22, 1997. She said Porter was eating and singing. She had been allowed out of the geri-chair to eat.

---

**2.** The administrator of the Nursing Home testified that the Human Services required an incident report only if a patient had left the facility for eight hours. An investigator for the Human Services however testified that an incident report would be required whenever a person left the facility, not when the resident had left for eight hours.

**3.** Counsel for the Appellants pointed out at trial that the only such detailed notes were on December 22, 1997, while the records beginning in 1996 (when Jones began working at the Nursing Home) up to December 1997 have no time or detailed notes.

Hawkins testified that around the Christmas holidays, the Nursing Home had lots of traffic from civic and Christian organizations visiting, and the alarm at the front door was left off because of traffic flow. She thought that Porter probably walked out with other people who were leaving the facility at the time.[4]

At around 5:30 p.m. on December 22, 1997, Traylor went outside to move her truck and saw Porter in the middle of the freeway. Traylor said that Porter smiled and then started to run off. Traylor was chasing Porter when a car ran over her.

It was just getting dark, around 5:30 p.m. as Robin Thompson was driving on the Central Expressway with his brother Kevin, when the cars in front of him began braking at the Pine Street exit, just in front of the Nursing Home, and Robin and Kevin saw something fly up in the air. Robin pulled over after his brother said that a person had been struck then called 911 before checking for vital signs on the body. He said that some people came over about five minutes after the impact and identified her as "Ms. Hattie." The people said they were from the Nursing Home and had been looking for her. Kevin said that the people kept on repeating that they had been chasing her.

Senior Corporal Lisa Melgoza of the Dallas Police Department testified that Porter had been struck but not run over by a vehicle. She said that the vehicle tried to brake, did a nose-dive while braking, and struck Porter's legs on her right side first before she was thrown up on the hood to hit the windshield with the left side of her head and being vaulted to the driver's side of the car. Porter's legs were first broken by the vehicle, then her ribs, and death caused probably by damage to her lungs and the aorta.

## The Investigation of the Human Services

Simon Polisky of the Texas Department of Human Services investigated Porter's death. He determined that Porter had a history of wandering and had physically left the Nursing Home facility approximately twenty times between August 1, 1997 and December 22, 1997.[5] The investigator also found that the Nursing Home relied on an alarm system and monitoring every two hours plus medication to control Porter's wandering. Coupled with the Nursing Home's failure to fill out incident reports on Porter's series of wandering since August 1997 and failure to supervise adequately, this posed a threat to the

4. The occurrence seems to have been frequent. The nurses' notes of the Nursing Home used this explanation as to how residents had wandered from the building on other occasions. Love testified that the Nursing Home had told her that Porter had walked out with a church group when Porter had been missing before and police had to be called.

5. The Human Services investigator gave as examples:

| | |
|---|---|
| August 3, 1997: | 5 a.m., Police called when Porter could not be located and returned by the police at 7 a.m. |
| | 10 a.m., Porter leaves facility again. |
| September 13, 1997: | 7:45 a.m., resident reached Central Expressway and Pine Street before staff retrieved her. |
| September 18, 1997: | 9:45 a.m., resident returned by an automobile from the location of Central Expressway and Metropolitan. |
| November 4, 1997: | 11:35 p.m., resident runs outside to Metropolitan before staff retrieves her. |
| December 22, 1997: | 10 a.m., resident leaves and it takes four people to return her. |
| | 3 p.m., resident leaves and it takes three people to return her. |

health and safety of the residents, the Human Services investigator reported.

Polisky said that had incident reports been properly filled out, then it would have been available for the Human Services to determine the existence of a problem and require different action from the Nursing Home than what it had been doing.

The trial was heard before a jury from February 9, 2000 through February 11, 2000. The jury found that the Nursing Home was negligent but not grossly negligent and awarded damages in the following amounts: $4,031.24 (pain/mental anguish; funeral and burial expenses) and $5,000 (future suffering). The trial court then assessed against the Nursing Home $9,031.24 in compensatory damages, $891.67 in prejudgment interest, and $2,262.20 in costs.

■ Love challenges the judgment of the trial court based on the sufficiency of the evidence and misconduct of the jurors. We will not reach the issue of the jury misconduct, as she urges us to do, since we cannot consider evidence of matters or statements occurring during jury deliberations. *See* TEX.R.CIV.P. 327(b); *also see Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 375 (Tex.2000)(holding Rule 327(b) is constitutional).

When the burden of proof is by clear and convincing evidence, we apply a heightened factual sufficiency standard of review. *In the Interest of B.R.*, 950 S.W.2d 113, 118–19 (Tex.App.-El Paso 1997, no writ). After considering all evidence, we determine whether the evidence was sufficient to produce a firm belief or conviction as to the truth of the allegations sought to be established. *Id.* at 119. Only if the fact finder could not have reasonably found the fact by clear and convincing evidence will the factual sufficiency point of error be sustained. *Id.* It is not our province to interfere with the jury's reso-

lution of the conflicts in the evidence or to weigh the credibility of the witnesses and their testimony. *Reynolds v. Kessler*, 669 S.W.2d 801, 807 (Tex.App.-El Paso 1984, no writ). Generally, a jury's resolution of the conflicts in the evidence is conclusive. *Clark v. Nat'l Life & Accident Ins. Co.*, 145 Tex. 575, 200 S.W.2d 820, 822 (1947).

■ For a claimant to recover exemplary damages in an wrongful death action, a wilful act, omission, or gross neglect must be proven by clear and convincing evidence. TEX.CIV.PRAC. & REM.CODE ANN. § 41.003(a)(3) & (b)(Vernon 1997). Gross negligence has both objective and subjective components. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 21–2 (Tex.1994). As viewed objectively, the conduct at issue must have created an "extreme degree of risk." *Id.* at 22. Considering the magnitude and probability of the potential injury, a mere remote possibility is not enough; a likelihood of serious injury must have been created. *Id.* The subjective component of gross negligence demands that the defendant had an actual, subjective awareness of the risk of harm to others and proceeded to act in conscious indifference to that risk. *Id.* at 23. Evidence of simple negligence will not satisfy the burden of proof, which may not be shifted to the defendant. TEX.CIV.PRAC. & REM. CODE ANN. § 41.003(b).

The evidence shows that the Nursing Home was aware of Porter's propensity to wander and that she had wandered from the facility at least twenty times between August 1, 1997 and December 22, 1997, sometimes as many as three times in a day. The administrator of the Nursing Home said that in spite of their monitoring and alarms on the doors, on the day of the accident, Porter was able to leave the facility by walking out with large groups of visitors to the Nursing Home, when the

alarm was left off. Such an incident had occurred at least once before, on October 12, 1997, when another resident wandered off with a visiting church group.

The Nursing Home was aware that its facility and policy was inadequate, since Porter was able to leave the facilities, the Nursing Home knew how she usually was able to do so, and the Human Services' determination of its inadequacy in early December 1997. Moreover, Rhonda Jones testified that the Nursing Home was trying to transfer Porter in November 1997. On the very day that Porter was killed, Jones had been trying to place Porter in another facility or at least a psychiatric hospital.

The evidence is troubling. The Nursing Home plainly had inadequate facilities to monitor Porter's wandering and was aware of that risk. However, whether it acted or omitted to act in conscious indifference to that risk is debatable. The Nursing Home was seeking to place Porter in a different facility at least as of November 1997; that it did not succeed in doing so is not a clear and convincing indication of conscious indifference to the risk that Porter would wander and be injured. The jury had the power to weigh the evidence and did not choose to find the Nursing Home acted with gross negligence. We cannot say that the evidence is such that the jury unreasonably refused to find gross negligence by clear and convincing weight of the evidence. We overrule issue one.

The judgment of the trial court is affirmed.